# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### BRUNSWICK DIVISION

GREATER HALL TEMPLE CHURCH OF
GOD,

               Plaintiff,

     v.

SOUTHERN MUTUAL CHURCH
INSURANCE COMPANY,

          Defendant.

CIVIL ACTION NO.: 2:17-cv-111

## O R D E R

This matter is before the Court on Defendant's Motions requesting the Court strike the expert testimony of John Kern, Shawn Brown, and Alfred Teston. Docs. 46, 47, 63. Plaintiff has filed Responses to all Motions, and they are now ripe for review. For the following reasons, the Court **GRANTS** Defendant's Motions to Strike the expert testimony of John Kern and Shawn Brown, docs. 46, 47, and **GRANTS in part** Defendant's Motion to Strike the Affidavit of Alfred Teston. Doc. 63.

## BACKGROUND

This case arises out of an insurance dispute. Plaintiff Greater Hall Temple Church of God ("Greater Hall") owns a church insured by Defendant Southern Mutual Church Insurance Company ("Southern Mutual"). Doc. 48-13 at 1–2. At some point, the church suffered water damage. Doc. 59 at 1. The parties dispute the cause of this water damage and whether the damage is covered under the insurance policy provided by Defendant. Plaintiff argues Hurricane Matthew damaged the church roof, causing the roof to leak. Id. at 2–3. Defendant contends the

water damage was instead caused by improper flashing and insufficient downspouts and, therefore, arose independent of any damage caused by Hurricane Matthew. Doc. 48-1 at 11; Doc. 48-8 at 2.

Defendant filed a motion for summary judgment, concurrently with two motions to strike the testimony of Plaintiff's experts, John Kern and Shawn Brown, regarding the cause of the church's water damage.[1] Docs. 46, 47, 48. Defendant argues these individuals are not qualified under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S 579 (1993), and Federal Rule of Evidence 702 to offer expert testimony on this issue. Docs. 46, 47. Defendant also moved to strike the affidavit and any expert testimony from a third potential expert, Alfred Teston. Doc. 63. Defendant contends Plaintiff failed to timely disclose Mr. Teston as an expert and is, therefore, barred from offering expert testimony. <u>Id.</u>

## DISCUSSION

Defendants have moved to strike the testimony of three witnesses—two (John Kern and Shawn Brown) on the grounds that they are not qualified to give expert testimony, and one, (Alfred Teston) because he was not properly disclosed as an expert within the time set by the Court's Scheduling Order. The Court first sets forth the standard for the admissibility of expert testimony established by <u>Daubert</u> and Rule 702 before addressing the admissibility of Mr. Kern's and Mr. Brown's testimony. The Court then turns to the admissibility of Mr. Teston's testimony and the timing of his disclosure as an expert witness.

---

[1] Defendant's motion for summary judgment appears as two separate docket entries. Docs. 43, 48. It appears that Defendant refiled the same motion with additional attachments, so the Court cites to that docket entry. Doc. 48.

## I.      Legal Standard

The Supreme Court's holding in Daubert and the text of Rule 702 require trial judges to serve as gatekeepers in determining the admissibility of expert testimony.  Fed. R. Evid. 702; Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999).  In this Circuit, courts routinely look to three elements to determine if an expert is qualified under Daubert and Rule 702.  As stated by the Eleventh Circuit, the elements for consideration are whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (citations omitted).  "[A]lthough there is some overlap among the inquiries into an expert's qualifications, the reliability of his proffered opinion and the helpfulness of that opinion, these are distinct concepts that courts and litigants must take care not to conflate."  Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003).

The trial court has broad latitude in evaluating each of these three factors.  As to qualifications, an expert may be qualified "by knowledge, skill, training, or education."  Hendrix ex rel. G.P. v. Evenflo Co., Inc., 609 F.3d 1183, 1193 (11th Cir. 2010).  The expert need not have experience precisely mirroring the case at bar in order to be qualified.  Maiz v. Virani, 253 F.3d 641, 665 (11th Cir. 2001).  However, where an expert does have experience directly applicable to an issue at bar, "[t]he Committee Note to the 2000 Amendments of Rule 702 also explains that 'nothing in this amendment is intended to suggest that experience alone . . .  may not provide a sufficient foundation for expert testimony.'"  Frazier, 387 F.3d at 1261.

As to reliability, courts look, when possible, to: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. Daubert, 509 U.S. at 593–94. However, these factors are not exhaustive, and "a federal court should consider any additional factors that may advance its Rule 702 analysis." Quiet Tech., 326 F.3d at 1341. Finally, as to the third Daubert factor, expert testimony is likely to assist the trier of fact to the extent that "it concerns matters beyond the understanding of the average lay person and logically advances a material aspect of the proponent's case." Kennedy v. Elec. Ins. Co., Case No. 4:18cv148, 2019 WL 2090776, at *5 (S.D. Ga. May 13, 2019) (citing Daubert, 509 U.S. at 591).

"The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999). However, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of proffered evidence." Quiet Tech., 326 F.3d at 1341. Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.

## II.     John Kern

Defendant moves to exclude the testimony of Plaintiff's expert John Kern. Doc. 46. Kern, at Plaintiff's request, inspected the interior and exterior of the church on April 24, 2017, approximately six and a half months after Hurricane Matthew passed through Brunswick, Georgia, and approximately three months before this suit was filed. Doc. 46-4 at 3. After

conducting a visual inspection and reviewing various documents and photographs, Kern authored

a two-page report in which he stated his opinion on the cause of the damage to the church. Doc.

46-4.[2] Specifically, Kern stated:

> The cause of a majority of the interior damage to the facility is due to the winds racking the wood frame structure and the wind causing uplift pressure on the R-Panel roof. The racking and uplift pressures has caused failure of the attachment screws. These types of roofs are susceptible to screw and washer failure. Typically, the screw holes are enlarged in the metal deck, and washers fail, making the roof leak. The roof has also undergone impact damage due to [Hurricane Matthew]. Based on the interior extent and locations of much of the damage, this is the cause for a majority of the damage. Concerning the flashing issues, the church did not have leaks prior to the substantial amount of rain. Flashing only failed when rain was excessive.

Id. at 4. Defendant characterizes this statement as offering various distinct opinions, but Kern's

central opinion is that Hurricane Matthew damaged the church roof, leading to additional water

damage inside the church. Doc. 46-1 at 4. The distinct opinions Defendant describes all support

Kern's overall causation opinion, so the Court determines whether Kern may tender his overall

conclusion as to the cause of the damage to the roof as an expert opinion at trial. Defendant

argues Kern is prohibited from offering this opinion because he lacks expert qualifications, his

opinions are unreliable, and his opinions are unhelpful to the trier of fact. Id. at 12–15.

## A.    Qualification Requirement

Kern currently works as a structural civil designer and is an engineer by training. Doc.

46-2 at 9. Kern obtained a bachelor's degree in civil engineering in 1973, completed some

---

[2]     Plaintiff does not indicate whether it intends this report as an expert report produced under Rule 26 of the Federal Rules of Civil Procedure. Plaintiff initially disclosed Kern as witness under Rule 26(a)(1) as an individual with "knowledge regarding the damages suffered by Plaintiff." Doc. 46-3 at 3. Plaintiff later produced Kern's report which is dated May 2, 2017 and addressed to Pastor Lee, the assistant pastor and minister of operations at Greater Hall. Docs. 46-4; 48-3 at 5–7. Because Defendant has not challenged Kern's disclosure as a witness and no party has put forward any other report authored by Kern, the Court presumes Plaintiff intended to utilize this report as either an expert report under Rule 26(a)(2)(B) or an expert disclosure under Rule 26(a)(2)(C).

coursework toward a master's degree in engineering, and completes roughly 20 to 25 hours of continuing education a year to maintain his license as a civil engineer. Id. at 10–11. Kern began his own business in 1980 and estimates that he designed "millions of square feet of roofing, inspected, probably, hundreds of thousands of square feet of roofing[,]" and he has designed "over 100 buildings a year" taking into account estimated wind pressures when constructing the roofing on those structures. Id. at 12–13. Specifically, Kern designs roofs to withstand the wind pressures provided by the International Building Code for each structure. Id. at 13. Kern frequently conducts "inspections for roof repairs due to wind and rain damage" but has only testified regarding rain and wind damage to roofs three times in his career. Id. at 6–7.

Defendant contends Kern is not qualified to offer expert testimony because he has limited working experience with R-Panel roofs, the type of roof at issue in this case. Doc. 46-1 at 13. As explained by Kern, an R-Panel roof is a type of metal roof which is secured to a building by screws. Doc. 46-2 at 21. Kern admits he does not use R-Panel roofs and expressed his disapproval of those types of roofs. Id. at 21. Kern instead prefers to use standing seam roofs, which do not utilize screws. Id. According to Kern, the very flaws he identified in the R-Panel roof in this case—that excessive wind will cause movement in the screws in the roof and result in leaking—are the reason he does not use those roofs in his own design. Id. Kern designed "two or three" buildings with R-Panel roofs at the beginning of his career, but generally has not designed a R-Panel roof since that time.[3] Id. None of the three cases where Kern testified regarding rain and wind damage to roofs involved an R-Panel roof, and Kern did not state how often he examines R-Panel roofs for damage outside of litigation. Id. at 23. However, when asked during his deposition, "in connection with damages suffered after any sort of storm event,

---

[3]    Kern stated that, at the time of his deposition, he was in the process of designing a building with an R-Panel roof because "[t]he client has insisted upon it[,]" over Kern's objection. Doc. 46-2 at 23.

is it common for you to see an R-Panel Roof?" Kern replied, "I have seen R-Panel roofs with leaks after storms, yes." Doc. 46-2 at 41–42.

The Federal Rules of Evidence provide that an expert must be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Not only must a witness have expertise, but the subject matter of the witness's testimony must be sufficiently within that expertise. Maiz, 253 F.3d at 665. However, an expert need not have experience precisely mirroring the case at bar, as the Eleventh Circuit made clear in Maiz when it affirmed a district court decision that an economist was qualified to offer expert testimony relating to lost profits in a real estate venture, despite his lack of experience with real estate development. Id. Courts generally do not impose a rigorous qualifications requirement but instead look to whether a proposed expert has minimal qualifications in the area in which they seek to testify. See e.g., Hendrix, 255 F.R.D. at 584–85 (finding an expert qualified to testify regarding the shattering of a child restraint system even when he had not "designed or molded a CRS"); Cason v. C.R. Bard, Inc., Case No. 1:12-cv-1288, 2015 WL 9913809, at *10 (N.D. Ga. Feb. 9, 2015) (finding an expert qualified to testify regarding the design and testing of medical devices even when he had not worked with the blood clot filter at issue in the case). That is not to say the qualifications requirement is a rubber stamp, and "[e]xpertise in one field does not qualify a witness to testify about others." Lebron v. Sec. of Fla. Dep't of Children & Families, 772 F.3d 1352, 1369 (11th Cir. 2014) (affirming the determination that a psychiatrist specializing in drug use and related disorders was not qualified to testify regarding the level of drug use among Florida applicants for federal assistance when he had no experience related to applicants for that program, "much less" applicants in Florida); see also United States v. Hollis, 780 F.3d 1064, 1069–70 (11th Cir. 2015).

However, the stringency, or lack thereof, of the qualifications requirement of Rule 702 does not abrogate the duty of the party offering the proposed expert, here the Plaintiff, to prove by a preponderance of the evidence that the proposed expert is in fact qualified to offer expert testimony. Allison, 184 F.3d at 1306. Ultimately, the "rules relating to Daubert issues are not precisely calibrated and must be applied in case-specific evidentiary circumstances that often defy generalization." United States v. Brown, 415 F.3d 1257, 1266 (11th Cir. 2005). Trial courts are afforded "considerable leeway" in determining whether an expert is qualified under Daubert, and it is the responsibility of the trial court as gatekeeper to determine, based on the evidence put forward by the proffering party, whether a proposed expert is qualified. Kumho Tire, 526 U.S. at 152.

The exact contours of Kern's experience are unclear. Kern's curriculum vitae is not in the record, and the only information the Court has concerning Kern's qualifications are the statements made during his deposition.[4] Doc. 46-2. As previously noted, Kern is an engineer by training and has designed many buildings and examined many damaged roofs, though his experience with the type of roof at issue in this case is very limited. Id. at 21. Moreover, the record is not clear on whether Kern's inspections of other roofs "due to wind and rain damage" entail Kern determining the cause of damage to a roof or merely determining the extent of the damage and what work is necessary to rectify that damage. Id. at 6–7. Accordingly, the Court can only say for certain that Kern has professional training as an engineer and general experience in designing roofs and inspecting them, sometimes after a storm. Id. at 6–13. The Court must determine whether this training and experience are sufficient to allow Kern to opine that

---

[4]     During Kern's deposition, defense counsel references Kern's CV, which was evidently provided to her. Doc. 46-2 at 5. However, this document was never filed with the Court.

Hurricane Matthew damaged the roof of Greater Hall and that roof damage caused the church to sustain additional water damage.

Courts considering an engineer's qualifications for offering expert opinion on the causes of structural damage engage in a fact-specific inquiry concerning the fit between the opinion offered and the expert's qualifications. E.g., Grand Reserve of Columbus, LLC v. Property-Owners Ins. Co., 721 F. App'x 886, 888 (11th Cir. 2018) (affirming a finding that an expert was qualified to opine that a roof was damaged by hail where he had examined more than a thousand roofs and had assessed hail damage for other insurance companies); Coconut Key Homeowners Ass'n, Inc. v. Lexington Ins. Co., 649 F. Supp. 2d 1363, 1371 (S.D. Fla. 2009) (finding an expert unqualified to testify as to the wind speeds during Hurricane Wilma or the cause of the damages to the condominiums at issue in the case where he specialized in window replacement and had no background in engineering or in pressure damage); see also Palm Bay Yacht Club Condo. Ass'n, Inc. v. QBE Ins. Corp., Case No. 10-23685, 2012 WL 1345317, at *5 (S.D. Fla. Apr. 18, 2012) (finding a claims adjuster with experience in over 15,000 insurance losses, including hurricane claims was qualified to offer an opinion that a hurricane was the cause of the damage to a building); Banta Properties, Inc. v. Arch Specialty Ins. Co., Case No. 10-61485, 2011 WL 13096476, at *2 (S.D. Fla. Dec. 22, 2011) (finding a professional engineer with minimal experience dealing with roofs not qualified to offer an expert opinion about roofs, but qualified to offer an expert opinion as to whether a hurricane damaged a property so long as he did "not opine on roof conditions that he did not observe or consider.").

Additionally, the United States District Court for the Southern District of Florida considered a similar proffered expert testimony Clena Investments, Inc. v. XL Specialty Insurance Company, 280 F.R.D. 653 (S.D. Fla. 2012). In Clena, the trial court had to determine

whether a professional engineer with experience designing buildings was qualified to opine that a building's roof was damaged by a particular hurricane rather than another storm or the normal passage of time.  Id.  The court determined the witness in that case was qualified to provide that opinion, noting the witness's experience ensuring building construction compliance with the Hurricane Code and his work in a side business conducting roof investigations.  Id. at 661.  This, coupled with the witness's educational background, resume, expert report, and testimony provided during a hearing on the motion to strike, convinced the court that the witness was qualified to testify as to whether the building at issue was damaged by a particular hurricane.  Id.

Kern's qualifications are similar in some respects to the witness in Clena.  Kern has an educational background in engineering and has designed many buildings over his career. However, that is where the similarities end.  Unlike the witness in Clena, who ensured compliance with the Hurricane Code and regularly investigated the cause of roof damage, there is no indication before the Court that Kern has any experience building structures to withstand storm winds or determining whether wind has caused roof damage.[5]  Additionally, unlike the record in Clena, the record here does not contain Kern's resume, and Kern's report is entirely silent as to his qualifications.  Doc. 46-4.  Kern also has extremely limited experience with R-Panel roofs like the roof at issue in this case.  He has designed only two or three building with that type of roof years ago and did not note during his deposition or any other documents provided to the Court how often he examined those sorts of roofs for damage.  Kern's dearth of experience with R-Panel roofs is important because his causation opinion turns largely on his view of the unique attributes of R-Panel roofs—a roofing system with which he has little

---

[5]        Kern designs buildings to comply with the International Building Code, which provides wind pressures each roof must tolerate, but Kern did not indicate this code is intended to address hurricane force winds rather than milder, more typical, weather conditions.  Doc. 46-2 at 13.

experience.  See Doc. 46-4 at 4 (Kern opining, "These types of roofs are susceptible to screw and washer failure.").

All of these facts lead the Court to conclude Plaintiff has not produced sufficient evidence to qualify Kern to opine that Hurricane Matthew damaged the church roof and that the church suffered water damage as a result.  The record is silent as to Kern's experience addressing wind velocity and diagnosing the cause of roof damage, which is at the heart of the testimony he seeks to offer in this case.  And he has very little experience with R-Panel roofs, the system at issue in this case.  Because Kern is not qualified to offer an expert opinion on this matter, Kern's testimony shall be limited to lay testimony permitted under Federal Rule of Evidence 701, and he may not offer expert opinion testimony on the issue of causation.

**B.    Reliability Requirement**

Even if Kern were qualified to offer expert testimony in this case, Plaintiff has not met its burden of establishing that Kern used a reliable methodology in forming his causation opinion. Doc. 46-1.  Kern's physical examination of the church property consisted of him climbing a ladder up to the roofline at "six or eight" different points and visually inspecting the roof.  Doc. 46-2 at 15.  Kern did not climb onto the roof or do any physical testing of the roof.  Id. at 15–16. Kern observed multiple screws holding down the roof, but he did not test or examine any of the screws and was unable to state which screws failed in the roof.  Id. at 26–27.  He also observed improper flashing at several areas on the roof.[6]  Id. at 36–37.  Kern also walked through the interior of the building and observed where water damage was present in the building.  Id. at 24. He did not compare those areas to the location of purportedly loose screws on the roof, but

---

[6]    Flashing is the placement of roofing materials in such a way as to prevent water from seeping into the interior of the building.  Doc. 48-4 at 10–11.

rather, noted that the damage was "throughout the facility[,]" including in the interior of the structure away from exterior walls. Id. at 30.

In addition to his physical examination of the property, Kern obtained weather data from the National Weather Service for the dates of October 7 and 8, 2016, when Hurricane Matthew passed through Brunswick. Id. at 20. However, he no longer has that data available and estimated during his deposition that the data he obtained concerned rain and wind measurements for a location approximately 20 miles away from the church and showed 8 to 10 inches of rain in the area with wind gusts up to 80 miles per hour. Id.

Kern also reviewed 125 undated photographs of the facility provided by "somebody from the church." Id. at 17.[7] In reviewing these photos, he did note several small dents in the roof suggestive of impact, which in his opinion suggested either hail, "or impact from things during the hurricane[,]" though he could not be certain of their origin. Id. at 28. Kern also reviewed a diagram of the roof and a separate report on the source of the roof damage prepared by Donan Engineering, an independent firm retained by Defendant to examine the roof. Id. at 16–18. Kern examined a January 11, 2017 letter from Alfred Teston, who inspected the roof, to Mr. Hall, the pastor of Greater Hall, who opined that the church did not have a leak until after Hurricane Matthew. Id. at 18. Finally, Kern spoke to the pastor of the church who told him that there had been no leaks at the building prior to the hurricane. Id. at 31.

---

[7] It is unclear whether these photographs are one of the two sets provided to the Court. Alfred Teston took one set of photographs and provided them to Greater Hall's Pastor, Bobby Hall. Doc. 48-10 at 19–85. Kern stated later in his deposition that he reviewed this letter from Teston to Hall and color photographs were attached to the letter. Doc. 46-2 at 18. Kern is unclear whether these are the 125 photographs he reviewed. The photographs taken by Teston number roughly that amount, but a date and time stamp are provided under each of Teston's photographs, unlike those Kern says he examined. Doc. 48-10 at 19–85. The second set are 76 photographs taken by an engineering firm retained by Defendant and contained in that firm's report. Doc. 48-4 at 18–55. Kern stated he reviewed this report in forming his opinion, doc. 46-4 at 3, but the report contains considerably fewer photographs than Kern claims to have examined.

As to the basis of his opinions, during his deposition, Kern stated that he did not know how much the roof had moved during the storm. Id. at 23. He further stated, "Nobody can measure the movement. I'm not there during the hurricane." Id. at 24. When asked how he knew whether there was movement in the roof, Kern responded, "I'm an engineer. There was movement." Id. When asked how his opinion that wind "caused enough uplift pressure on the R-Panel roof to result in the interior damage to the church" could be tested, Kern stated, "I'm not sure you could." Id. at 25. Further, when asked how his opinion that "the winds caused the racking of the wood-frame structure sufficient to cause the interior damage to the church" could be tested, Kern responded, "I don't think you could do that either. My experience tells me that wind issues, both uplift and racking, has issues with the screws. Just by my inspection on the roof things were loose, caused the damage." Id. However, he was not able to identify any screw that he claimed had shifted so as to create a leak. Rather, he stated, "I'm not going to suggest to you that you can even see a failure of an attachment screw. What happens is attachment screws, any movement in the decking can cause a leak, even if you can't see it." Id. at 26.

Ultimately, Kern's opinion is that wind racking and uplift caused a majority of damage to the roof. Id. at 28, 30. He bases that opinion on his observations of undated photographs showing multiple impacts to the roof and his belief that failed flashing alone would have produced specific moisture at specific locations, not the extensive moisture to the interior of the building which he observed. Id. In support of his claim of improper flashing installation, Kern stated that there was a visible gap between the flashing and the wall of the church at multiple points and that expansion foam had been improperly used as sealant at certain locations. Id. at 36–37. Kern's claim that no leaks were present before the hurricane were drawn exclusively from information provided by other individuals. Id. at 30–31. He stated that his opinion would

likely have been different if he had seen photographs of water damage preexisting the hurricane. Id. at 19.

While numerical measurements and replicable tests are not necessarily required for non-scientific experience-based testimony, an expert must provide more than mere *ipse dixit* in support of his opinion. Frazier, 387 F.3d at 1261–62. Stated alternatively, "[a] district court cannot simply accept that an opinion is reliable because the expert says that his methodology is sound." United States v. Azmat, 805 F.3d 1018, 1042 (11th Cir. 2015) (citations omitted). The proffering party must instead show that the expert's theory can and has been tested, has been subjected to peer review, has a known rate of error, is generally accepted in the expert's professional community, or is reliable through some other metric. Daubert, 509 U.S. at 593–94. An expert can extrapolate to some degree based upon available data, "[b]ut nothing in Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). "If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong." Frazier, 387 F.3d at 1261.

In this case, Kern's methodology is not reliable. First, the data forming the basis for Kern's opinions is questionable. Kern relied largely on second-hand information, which was not preserved or clearly identified, and his poorly documented visual inspection, which he conducted six and a half months after the purported damage occurred. Specifically, Kern drew his opinion that the church had no preexisting water damage from his conversation with the church's pastor and his review of a report prepared by Mr. Teston, who originally installed and later inspected

the roof.  Doc. 46-2 at 18–19, 31.  Kern also studied undated photographs showing impact marks of unknown origin on the roof, as well as data, which he could not produce to Defendant, from the National Weather Service for an area within 20 miles of the church.  Doc. 46-2 at 20, 28.  An expert can rely on second-hand facts or information, but only where the information is of the type reasonably relied on by experts in the field.  See Banta Properties, Inc., 2011 WL 13096476, at *3.  Here, Plaintiff has failed to show that any expert in Kern's field would reasonably rely on undated photographs, statements by an interested party, unpreserved weather data, or a brief visual inspection in forming an opinion.

More concerning is Kern's explanation (or lack thereof) of the link between the data he collected to his conclusion.  Several times during his deposition, Kern stated that his opinion was drawn from the fact that he is an expert and that he could not further elaborate on his reasoning aside from his qualifications.  Doc. 46-2 at 24–25.  When asked how he knew the church roof had moved, Kern rested squarely on his qualifications and responded, "I'm an engineer.  There was movement."  Id. at 24.  Kern did not provide any meaningful basis for his opinion beyond his qualifications.  He did not provide any photographs or documentation of his physical inspection of the church, nor did he measure movement in the roof or conduct any testing to determine where the roof was leaking.  Id. at 15–25.  Kern did not examine any individual screws in the roof or explain why he could not test individual screws for failure.  Id. at 26.  Additionally, Kern does not discuss his methodology at any point in his two-page expert report.  Doc. 46-4.  At no point in the record does Kern establish a methodology linking the data he evaluated to his conclusion that Hurricane Matthew damaged the roof of Greater Hall.[8]  This is

---

[8]      In its Response to Defendant's Motion, Plaintiff notes that Kern climbed to the roofline in six or eight places and was able to see the roof clearly from there.  Doc. 55 at 3.  This goes only to how Kern collected the data providing the basis for his opinion, not to how that data actually supports Kern's opinion.  Plaintiff's Response is silent on this point.

not sufficient to merit admissibility under Daubert.  See Frazier, 387 F.3d at 1261 (noting that where a witness relies on experience in forming an opinion, the witness must link that experience to their ultimate conclusion and explain how the experience is applicable to the case at bar).  In short, Plaintiff has failed to prove by a preponderance of the evidence that Kern employed a reliable methodology in forming the opinion contained in his expert report.

Based upon Kern's expressed rationale, the Court finds the methodology underlying Kern's opinion not sufficiently reliable to allow his opinion to be placed before a jury.  Having found that Kern is not qualified to tender expert testimony in this matter and that the methodology underlying his opinions is not reliable, the Court **GRANTS** Defendant's Motion to Exclude Testimony of John Kern.  Doc. 46.  Kern is not permitted to tender expert testimony in this case.  Kern's testimony shall be limited to lay testimony permitted under Federal Rule of Evidence 701, and he may not offer expert opinion testimony on the issue of causation.

## III.    Shawn Brown

Defendant also moves to exclude the expert testimony of Shawn Brown.  Doc. 47. Brown visited the church on four occasions after Hurricane Matthew in order to bid for the roof repair contract and accompany subsequent insurance adjusters during their inspections.  Doc. 47-3 at 19.  Brown gave an initial estimate on December 5, 2016 of approximately $160,000 to replace the church roof.  Doc. 47-4 at 1.  He subsequently prepared an expert report on December 14, 2018 reflecting a repair estimate of approximately $250,000 and an opinion that Hurricane Matthew damaged the church with "high winds and rain which occurred in October, 2016."[9]  Doc. 47-2 at 1.  Defendant moves to exclude Brown's opinion as to causation on the grounds of his qualifications, his methodology, and his helpfulness.  Doc. 47.

---

[9]      Brown stated that the $90,000 increase in his cost estimate was due to a dramatic increase in material costs between the two estimates.  Doc. 47-3 at 32.

## A. Qualification Requirement

Brown's has a bachelor's degree in education and a minor in construction engineering. Doc. 47-3 at 4. Brown gained his first experience with roofing over a three-year period in 2002 when serving as an external project manager for Turner Construction. Id. at 5–6, 11. Brown supervised subcontractors as they constructed a six-floor building for Southeast Georgia Regional Medical Center. Id. at 5. However, Brown's personal involvement in the roofing of that building was limited to occasional supervision of the installation of the roof, 15 to 25 percent of which was metal. Id. at 12. Brown did not gain any substantial experience with roofing until 2014, when he placed a metal roof on his mother's home. Id. at 11. Two years later, he began his own roofing business, and to date, has installed roughly 30 metal roofs, most of which are on private homes, but three were on churches. Id. at 15.[10] These metal roofs are all R-Panel roofs, like the roof at issue in this case, and aside from the relatively larger size of the church roofs, Brown did not note any meaningful distinction between the church roofs and the residential roofs he installed. Id.

Brown's roofing knowledge is almost entirely self-taught and was drawn from observing other roofers during his time at Turner Construction, watching various instructional videos online, studying various books, and consulting with friends and colleagues with roofing experience. Id. at 13. Brown is a licensed contractor in Glynn County, Georgia, but has never given a deposition before. Id. at 18, 23. Brown has no educational background in evaluating wind velocity or its impact on structures. Id. at 23–24. Moreover, Brown admits that he has no practical experience in determining the effect of wind velocity on a metal roof. Id. at 38–39.

---

[10] At the time of his deposition, Brown was preparing to install a metal roof on a fourth church. Doc. 47-3 at 15.

Brown concedes that his original purpose in examining the church was to produce a cost estimate for repairs, not to give an opinion as to what caused the damage to the church. Id. at 36.

Defendant argues Brown is not qualified to offer an expert opinion because he "admits he has no experience or education that would enable him to determine how much wind it would take to move a metal roof[.]" Doc. 47-1 at 10. Defendant further argues that his experience in roofing is limited to the last five years and that he possesses no formal education in this area. Id. In response to Defendant's Motion, Plaintiff makes two points regarding Brown's qualifications: first, that Defendant has submitted copies of a report by an Andrew Mickley, doc. 48-4; doc. 48-9, who Plaintiff contends is less qualified than both Brown and Kern; and second, that "[a]nyone who lived in Glynn County during October, 2016, had the opportunity to see that many roofs were damaged in the hurricane that passed through the area during that time . . . It does not take someone with an advanced educational degree to observe damage caused by wind." Doc. 55 at 2–3.

Here, Brown opines "that the work which [he] found to be necessary for repairs to the church was caused by high winds and rain which occurred in October, 2016." Doc. 47-2 at 1. Brown must, therefore, show that he is be qualified "by knowledge, skill, training, or education[]" to offer that opinion. Hendrix, 609 F.3d at 1193. Brown has installed more than 30 roofs of the type at issue in this case. Doc. 47-3 at 15. However, he conceded that he does not have any experience or education in determining how much wind velocity is required to lift a metal roof. Id. at 38. Brown has put forward evidence that he has experience installing R-Panel roofs but has not put forward any evidence that he has experience determining the cause of damage to those roofs. This lack of training or experience renders Brown unqualified to offer his opinion to a jury that high winds and rain in October 2016 damaged the church roof. See

Coconut Key, 649 F. Supp. 2d at 1371 (finding an expert unqualified to testify as to the wind speeds during Hurricane Wilma or the cause of the damages to the condominiums at issue in the case where he specialized in window replacement and had no background in engineering or in pressure damage); cf. Grand Reserve of Columbus, 721 F. App'x at 888 (affirming a finding that an expert was qualified to opine that a roof was damaged by hail where he had worked in that field for 26 years, examined more than a thousand roofs and had assessed hail damage for other insurance companies). The Court finds Brown's limited roofing experience does not sufficiently relate to the opinion he intends to offer to the jury, and he is, therefore, barred from offering that opinion at trial.

Plaintiff's counter arguments are unavailing. Plaintiff first points to the qualifications of Andrew Mickley, who prepared an expert report for Defendant. Doc. 55 at 3–4. But the requirements set forth by Daubert do not turn on the qualifications of another party's purported experts. If Plaintiff believed Mr. Mickley to be unqualified, it could have filed a Daubert motion of its own within the deadline set by the Court. It cannot, however, lower the qualification requirements for its own experts by pointing to Mr. Mickley. Plaintiff next asserts the wind damage caused by Hurricane Matthew was observable to anyone in Glynn County at the time of the storm. Id. at 2–3. However, that point says nothing about Brown's ability to offer expert opinion in this case regarding the durability of the church's roof or the cause of any damage to that roof.

Because Plaintiff fails to put forward sufficient evidence indicating that Brown is qualified to testify regarding the cause of the damage to the roof, Brown is not permitted to tender expert testimony in this case. Brown's testimony shall be limited to lay testimony

permitted under Federal Rule of Evidence 701, and he may not offer expert opinion testimony on the issue of causation.

### B. Reliability Requirement

Even if Brown were qualified to offer testimony regarding the cause of the damage to Greater Hall's roof, Plaintiff has not demonstrated Brown used a sufficiently reliable methodology to reach his opinion.

Brown was first contacted by Bobby Hall, the pastor of Greater Hall, approximately three weeks after Hurricane Matthew passed through Brunswick. Doc. 47-3 at 19.[11] Pastor Hall requested that Brown inspect the church to find a leak. Id. When Brown arrived at the church, Pastor Hall informed him that the roof had recently begun leaking. Id. at 24. Brown inspected the church and then prepared his initial estimate on the repair cost a few weeks later on December 5, 2016. Doc. 47-3 at 21; Doc. 47-4. Brown inspected the roof a second time when an insurance representative visited the church. Doc. 47-3 at 27.[12] The representative did not feel comfortable climbing onto the roof, so Brown climbed it and took photos at his request. Id. Brown visited the church a third time with another Southern Mutual representative sometime during the spring. Id. at 29. Brown visited the church a fourth and final time at an unknown date to meet with a district representative from the Church. Id. at 30.

During his first inspection, Brown climbed onto the church roof and observed broken screws and loose metal on the roof. Id. at 25. Brown stated he was able to lift up portions of the

---

[11] In total, Brown visited the church four times, once with Pastor Hall, and once each with three other individuals, including insurance representatives, who were examining the church for damage. Doc. 47-3 at 19. Brown was present with each of these individuals to ensure "they were on the same page[,]" regarding where the roof was leaking. Id.

[12] Brown states this inspection occurred during the winter, but he is unsure of the exact day or month. Doc. 47-3 at 27.

roof and see the bottom portion of the screw intended to secure the roof in the wood while the top portion of the screw was still in the metal of the roof. Id. Brown estimated that he found 15 to 20 screws in this condition. Id. Brown did not take any photographs of the roof during his inspection because his purpose in examining the building was to identify the leak and provide an estimate cost to fix it. Id. During his second inspection, Brown took photos at the request of an insurance representative and also crawled into the church attic where he observed the trusses. Id. at 27. He observed a "movement print" near multiple trusses, leading him to believe that they had shifted. Id. at 27–28. He measured the movement of those trusses with a tape measure and estimated that four or five trusses had shifted approximately two to five inches. Id. at 36–37. He further observed that many of the nails securing the trusses to the platform they were installed upon were bent at an angle. Id. at 28. Brown believed those trusses were installed when the church was built around 1950. Id. at 38. Brown did not make any additional observations during his third of fourth visits to the church. Id. at 29–30. Brown stated that, when walking through the church on one of his inspections, he observed water damage to approximately three percent of the walls. Id. at 30.

Brown did not review any other records or documents in forming his opinion on the cause of the damage to the church. Id. at 19. Aside from his measurement of the trusses, Brown did not obtain any other measurements of or conduct any kind of testing to the roof or trusses. Id. at 38. Brown was unable to say if any of the water damage to the church predated Hurricane Matthew and had not inspected the roof or trusses prior to the storm. Id. at 27–28, 30. Brown stated his belief that rain and wind damaged the church was based on "common sense" and his own observations of the strength of Hurricane Matthew, as he lived approximately six blocks

away from the church during the storm.  Id. at 38–40.  Brown did not obtain measurements for the wind speed or rainfall during Hurricane Matthew.  Id. at 40.

The Court does not find the methods Brown used to collect data and reach his conclusions sufficiently reliable to enable him to offer expert testimony on the issue of causation. Ultimately, Brown's methodology and opinion are as follows: Brown personally observed Hurricane Matthew; Greater Hall's roof exhibited damage sometime after the storm; and a "common sense" conclusion that the storm must have caused that damage.  Id. at 39.  This approach is not sufficiently reliable under Daubert.  Rider v. Sandoz Pharm. Corp., 295 F.3d 1194, 1202 (11th Cir. 2002) ("Courts are cautioned not to admit speculation, conjecture or inference that cannot be supported by sound scientific principles.").

Brown's methodology in examining the church was limited to a physical examination with some measurements of the church's trusses.  Doc. 47-3 at 25–27, 36–37.  Brown had no measurements of the wind speeds during Hurricane Matthew and had no independent knowledge of the condition of the church or its roof prior to Hurricane Matthew.  Id. at 24, 27, 40. Moreover, Brown's visual examination of the building, without any knowledge of the buildings prior condition or knowledge of the wind speeds the building was subjected to, is not a sufficiently reliable methodology to allow Brown to provide an expert opinion as to the cause of the roof damage.  Compare Coconut Key, 649 F. Supp. 2d at 1371 (expert's methodology in forming an opinion concerning the cause of roof damage was not reliable where expert did not know wind speed in the area during the storm in question, had not ruled out alternative causes of roof damage, and had no background in engineering) with Clena, 280 F.R.D. 653 at 664 (expert's methodology in forming an opinion concerning the cause of roof damage was reliable where a trained engineer reasoned that the damage had been caused by the second of two

hurricanes because if it had been preexisting, the roof would have been ripped off during the second storm). Without a reliable methodology, a witness's testimony should not be cloaked in the imprimatur of expert testimony.

Because Brown is not qualified to opine that Hurricane Matthew caused the damage to Greater Hall, and his methodology in reaching that same opinion is not reliable, I **GRANT** Defendant's Motion to Exclude Testimony of Shawn Brown. Doc. 47. Brown's testimony shall be limited to lay testimony permitted under Federal Rule of Evidence 701, and he may not offer expert opinion testimony on the issue of causation.

## IV.    Alfred Teston

Defendant finally moves to strike the affidavit of Alfred Teston. Doc. 63. Teston is the owner of Coastal Roofing Company and installed the roof at issue in this case onto Greater Hall. Doc. 59-3. Plaintiff first identified Teston in its supplemental responses to Defendant's interrogatories. Doc. 67-3 at 1.[13] This response provided only Teston's name, address, and telephone number but did not provide any description of any possible testimony by Teston. Id. Teston was not deposed. At some point, Defendant obtained a very brief letter sent from Teston to Pastor Hall, stating "[D]ue to our inspection, the church did not leak until after Hurricane Matthew." Doc. 48-10 at 18. This letter was accompanied by photos of the church interior and roof. Id. at 19–85.

Teston then gave a sworn affidavit on June 17, 2019, which Plaintiff produced in its Response to Defendant's Motion for Summary Judgment. Doc. 59-3. In this affidavit, Teston states that he installed the roof at issue in this case onto Greater Hall and that the roof trusses were in good condition when he installed the roof in 2015. Id. at 1–2. Teston then states that he

---

[13]    This response is not dated, but Defendant acknowledges that it was served at some point during the discovery period. Doc. 67 at 2; Doc. 67-3.

inspected the roof at some point after Hurricane Matthew, and he observed that the roof had shifted. Id. at 3. He states that "[t]he movement of the roof is consistent with being subjected to high winds" and that he "could see many locations were wind had travelled under the metal sheets, which caused many of the metal sheets to be bent and lifted up." Id. He concludes that "[a]ll of the damage he observed caused the roof leak." Id.

Defendant contends Teston's affidavit offers expert testimony. Doc. 63-1 at 3. Defendant further contends that Plaintiff did not disclose Teston as an expert within the time allotted by the Court in its May 21, 2018 Scheduling Order, which required Plaintiff to serve all expert witness reports by December 14, 2018. Doc. 14. Defendant moves the Court to strike Teston's affidavit on the basis of this allegedly untimely disclosure. Id. at 1.

### A. Plaintiff was Required to Disclose Teston as an Expert Witness

The Federal Rules of Civil Procedure create three classes of witnesses for purposes of disclosure. The first are lay fact witnesses whom the proffering party must disclose along with a brief description of that witness's likely knowledge of the case. Fed. R. Civ. P. 26(a)(1)(A). The second class of witnesses are those "retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B). These witnesses must prepare an extensive report including:

(i)     a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii)    the facts or data considered by the witness in forming them;

(iii)   any exhibits that will be used to summarize or support them;

(iv)    the witness's qualifications, including a list of all publications authored in the ten previous years;

> (v)     a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> (vi)     a statement of the compensation to be paid for the study and testimony in the case.

Id. The third class of witness was created by the 2010 amendment to the Federal Rules and includes expert witnesses who are not "retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." For these witnesses, the proffering party need only produce a disclosure stating: (i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify. Fed. R. Civ. P. 26(a)(2)(C)

Whether Plaintiff properly disclosed Teston turns on which of the three categories of witnesses he falls. In his affidavit, Teston states he installed the roof at issue in this case on to the church in 2015. Doc. 59-3 at 1. He inspected the roof trusses at the time he installed the roof and they appeared to be in good condition and properly aligned. Id. at 2. He states he inspected the roof after Hurricane Matthew, and he noticed "that the entire roof had shifted" as well as several other visible signs of damage before opining that the cause of that movement was consistent with high winds. Id. He finally states that the movement in the roof was the cause of roof leaks. Id. Some of this testimony, though not all of it, is expert testimony requiring the disclosure of Teston as an expert witness within the time set by the Court.

Plaintiff suggests that Teston is not offering an expert opinion, stating that Teston "is not serving in an expert capacity for the Plaintiff, although he does have decades of experience as a roofer and is licensed as such." Doc. 65 at 1. Many things contained in Teston's affidavit are permissible lay testimony. To the extent Teston wishes to recount his physical observations, he

is free to do so.  However, opinions as to the cause of the damage to the roof and the source of any subsequent leaks are expert testimony based upon "scientific, technical or specialized knowledge" outside of the scope of a lay witness.  Fed. R. Evid. 701(c).  See e.g., Ware v. Nationwide Ins. Co., Case No. 7:11-cv-4272, 2013 WL 1680514, at *4 (N.D. Ala. Apr. 12, 2013) ("While a lay witness may be able to recognize and testify about whether a roof is damaged, such a witness is not capable of reaching an informed conclusion about whether that damage arose due to a product defect, poor workmanship, natural wear and tear, storm damage, or some other cause."); see also Nix v. State Farm Fire & Cas. Co., Inc., 444 F. App'x 388, 390 (11th Cir. 2011) (finding that witnesses could not offer lay testimony that a leak in a basement was due to a burst water pipe rather than a design defect in the basement wall where the witnesses had not observed the wall collapse or had personal knowledge about the construction of the home).[14] Because Teston seeks to offer an opinion as to the cause of structural damage to the church, that opinion is outside the scope of his lay testimony.

Because the opinion contained in Teston's affidavit is outside the scope of his permissible lay testimony, Plaintiff should have identified him as an expert.  In its Response to Defendant's Motion to Strike Teston's affidavit, Plaintiff asserts that Teston "is more like a treating physician rather than a witness who is serving in an expert witness capacity."  Doc. 65 at 1.  This argument is misplaced.  Treating physicians are subject to disclosure requirements when they offer expert testimony, though whether they must produce an expert report or merely an expert disclosure depends on the nature of that expert testimony.  See, e.g., Rangel v. Anderson, 202 F. Supp. 3d 1361, 1365 (S.D. Ga. 2016) (discussing the impact of Rule 26 on the disclosure

---

[14]     The Court notes Teston's opinions are of the same nature as the opinions offered by Kern and Brown, who Plaintiff attempted to tender as experts.  Doc. 55.

of treating physicians). As previously discussed, Plaintiff seeks to have Teston offer an expert opinion. In this case, Plaintiff only provided the name and contact information of Teston to Defendant, not any expert report or expert disclosure. Doc. 67-3. Thus, even were Teston analogous to a treating physician, Plaintiff's disclosure would be inadequate to meet the requirements of Rule 26(a).

### B.  Teston's Expert Opinions Should be Excluded

Because Teston should have been disclosed as an expert, the Court must now address whether this failure to disclose merits the exclusion of Teston's opinion testimony. The Federal Rules require a court to strike the testimony of an improperly disclosed witness unless the failure to disclose was "substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "The burden for establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party." Leathers v. Pfizer, Inc., 233 F.R.D. 687, 697 (N.D. Ga. 2006). Courts routinely weigh five factors when determining whether an insufficient disclosure is harmless:

> (1) the surprise to the party against whom the evidence would be offered;
>
> (2) the ability of that party to cure the surprise;
>
> (3) the extent to which allowing the evidence would disrupt the trial;
>
> (4) the importance of the evidence; and
>
> (5) the nondisclosing party's explanation for its failure to disclose the evidence.

See Rangel, 202 F. Supp. 3d at 1366 (citing Cambridge Univ. Press v. Becker, Case No. 1:08-cv-1425, 2010 WL 6067575, at *3 (N.D. Ga. Sept. 21, 2010)); Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003) (setting forth the five-factor test). Three of these five factors cut against a finding that Plaintiff's failure to disclose Teston as an expert was harmless.

First, Defendant can fairly claim surprise in response to the late disclosure of Teston's affidavit. Teston was disclosed as a lay witness, and Plaintiff informed Defendant in its supplemental response to Defendant's interrogatories that "Plaintiff is not aware of any such inspections [of the church] other than inspections done by the property and casualty insurers of the church and by the Defendant's representatives following the subject loss, as well as John Kern, whose records have been furnished." Doc. 67-3 at 2. Defendant did, at some point, obtain a copy of a letter from Teston to Pastor Hall reflecting his opinion that the church began leaking after Hurricane Matthew.[15] Doc. 48-10 at 18. However, Plaintiff at no point signaled an intention to rely on that opinion, and the letter itself provided very little insight into Teston's opinion. Accordingly, an affidavit by Teston indicating that he believes Hurricane Matthew caused damage and movement to the church roof can fairly be taken as a surprise to Defendant.

As to the second factor, Defendant's ability to adequately cure any surprise is limited. Defendant's ability to question Teston is curtailed by the fact that discovery has closed. Doc. 33. Plaintiff was required to serve its expert witness reports by December 14, 2018, and the deadline for discovery depositions of expert witnesses closed on April 30, 2019. Docs. 14, 33. Teston provided his affidavit on June 17, 2019, and Plaintiff filed it a day later on June 18, 2019. Doc. 59-3. Plaintiff did not put forward Teston's expert opinion until after not only the close of discovery, but after Defendant filed a motion for summary judgment. Doc. 48. This case is currently set for jury selection on March 24, 2020, and Defendant would not be able to cure any surprise from this affidavit without the Court reopening discovery.

The fifth factor also cuts against a finding of harmlessness. Plaintiff has not provided an explanation for its failure to disclose Teston as an expert witness within the allotted discovery

---

[15] It is unclear when Defendant got this document or who produced it, though Plaintiff mentions that Defendant served requests for production on Mr. Teston. Doc. 65 at 1.

time.  Doc. 59-3.  In its Response to Defendant's Motion to Strike, Plaintiff notes that Teston's

affidavit is intended to address the "suggestion" in Defendant's motion for summary judgment

that "the movement of the roof trusses of the roof system at the church which was found by

Shawn Brown pre-dated the hurricane[.]"  Id.  However, Plaintiff does not explain why he did

not attempt to place this information into evidence prior to the close of discovery.

Plaintiff has not met its burden of establishing that its failure to disclose the opinion of

Teston within the time set by the Court was substantially justified or harmless.  Defendant had

no indication that Plaintiff was intending to rely on Teston's opinion and was not aware of

Teston's full opinion until Plaintiff produced his affidavit.  Doc. 67 at 2.  Defendant's ability to

cure this late disclosure is limited because discovery in this case has already closed.  Doc. 33.

And Plaintiff has not stated why he did not timely produce Teston's affidavit or an expert

disclosure.  Plaintiff indicates that Teston's affidavit is meant to rebut Defendant's motion for

summary judgment, but Plaintiff was, nonetheless, required the meet the disclosure requirements

of Rule 26.

Although allowing Teston's affidavit into evidence would likely not cause a substantial

disruption to trial and Teston's opinion could be important to Plaintiff's case, this is not enough

to overcome an otherwise unjustified and harmful failure to disclose an expert opinion.[16]  See

Mitchell v. Ford Motor Co., 318 F. App'x 821, 824–25 (11th Cir. 2009) (affirming a district

court order excluding expert testimony leading to the dismissal of plaintiff's case where the

expert's disclosure was untimely without any reasonable explanation).

---

[16]     The Court notes that excusing Plaintiff's late disclosure would not render Teston's opinion admissible.  Plaintiff would still have to qualify Teston as an expert in order for his opinion to be placed before a jury.

Because Teston was not timely disclosed as an expert and his affidavit attempts to offer expert testimony, I **GRANT in part** Defendant's Motion to Strike the Affidavit of Alfred Teston. Teston's affidavit is struck to the extent that it attempts to offer expert testimony on the issue of causation. Teston's testimony shall be limited to lay testimony permitted under Federal Rule of Evidence 701, and he may not offer expert opinion testimony on the issue of causation

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motions to Strike the expert testimony of John Kern and Shawn Brown, docs. 46, 47, and **GRANTS in part** Defendant's Motion to Strike the Affidavit of Alfred Teston. Doc. 63. Kern, Brown, and Teston are prohibited from offering expert testimony as to the cause of the damage to the church's roof, as well as the cause of any water damage to the church. Testimony from Kern, Brown, and Teston shall be limited to lay testimony permitted under Federal Rule of Evidence 701, and these witnesses may not offer expert opinion testimony on the issue of causation.

**SO ORDERED**, this 30th day of August, 2019.

_____
BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA